Peter E. Schnaitman, Esq., SBN 218982
 schnaitman@huntortmann.com
HUNT ORTMANN PALFFY
NIEVES DARLING & MAH, INC.
301 North Lake Avenue, 7th Floor
Pasadena, California 91101-1807
Phone:  (626) 440-5200    Fax:  (626) 796-0107

Attorneys for Receiver Jerry E. Peer, Jr.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROOT, INC., CARET HOLDINGS, INC., ROOT INSURANCE AGENCY, INC,, <br><br> Plaintiffs, <br><br> vs. <br><br> BRINSON CALEB "BC" SILVER WILLIAM CAMPBELL, COLLATERAL DAMAGE, LLC., ECLIPSE HOME DESIGN, LLC QUANTASY & ASSOCIATES. LLC, PAIGE MCDANIEL, <br><br> Defendant. | Case No. <br><br> **AMENDED NOTICE OF FILING PURSUANT TO 28 USC § 754** |

HUNT ORTMANN PALFFY
NIEVES DARLING & MAH, INC.
301 NORTH LAKE AVENUE, 7TH FLOOR
PASADENA, CALIFORNIA 91101-1807
Tel (626) 440-5200 • Fax (626) 796-0107

## AMENDED NOTICE OF FILING

Comes now, the Receiver, Jerry E. Peer, Jr. of Peterson Conners LLP, by and through undersigned counsel, and in accordance with 28 USC § 754, hereby gives notice of the filing of the following documents from the action styled *Root, Inc. et al, v. Brinson Caleb Silver, et al*., Case No.: 2:23-cv-00512, venued in the U.S. District Court for the Southern District of Ohio, Eastern Division as follows:

///

| Exhibit # | Documents |
|-----------|-----------|
| 1. | Verified First Amended Complaint for Damages and Injunctive Relief. [Dkt. # 20] |
| 2. | Order Appointing Receiver [Dkt. # 101 ] |
| 3. | Order Amending Order Appointing Receiver [Dkt. # 120 ] |

DATED:  June 13, 2023

HUNT ORTMANN PALFFY
NIEVES DARLING & MAH, INC.


By: _____

PETER E. SCHNAITMAN
Attorneys for Receiver Jerry E. Peer, Jr.

HUNT ORTMANN PALFFY
NIEVES DARLING & MAH, INC.
301 NORTH LAKE AVENUE, 7TH FLOOR
PASADENA, CALIFORNIA 91101-1807
Tel (626) 440-5200 • Fax (626) 796-0107

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **ROOT, INC.** | : | |
| 80 E Rich St., Suite 500 | : | |
| Columbus, OH 43215, | : | |
|  | : | **Case No. 2:23-cv-00512** |
| **CARET HOLDINGS, INC.** | : | |
| 80 E Rich St., Suite 500 | : | |
| Columbus, OH 43215, | : | **Judge Sarah D. Morrison** |
|  | : | |
| **ROOT INSURANCE AGENCY, LLC** | : | |
| 80 E Rich St., Suite 500 | : | |
| Columbus, OH 43215, | : | **JURY DEMAND ENDORSED HEREON** |
|  | : | |
| *Plaintiffs*, | : | |
|  | : | |
| v. | : | |
|  | : | |
| **BRINSON CALEB "BC" SILVER**, | : | |
| 6311 Summertime Ln. | : | |
| Culver City, CA 90230-4579, | : | |
|  | : | |
| **WILLIAM CAMPBELL,** | : | |
| 1250 Wynn Rd. | : | |
| Pasadena, CA 91107-1547, | : | |
|  | : | |
| **COLLATERAL DAMAGE, LLC,** | : | |
| Registered Agent: LEGALZOOM.COM, | : | |
| Inc. | : | |
| 101 N Brand Blvd., 11th Floor | : | |
| Glendale, CA 91203, | : | |
|  | : | |
| **ECLIPSE HOME DESIGN, LLC** | : | |
| Registered Agent: United States | : | |
| Corporation Agents, Inc. | : | |
| 651 N. Broad St., Suite 201 | : | |
| Middletown, DE 19709, | : | |
|  | : | |
| **QUANTASY & ASSOCIATES, LLC,** | : | |
| Registered Agent: ERESIDENT AGENT, | : | |
| Inc. | : | |
| 7801 Folsom Blvd., Suite 202 | : | |
| Sacramento, CA 95826, | : | |
|  | : | |

**PAIGE MCDANIEL**                    :
5576 Alexanders Lake Rd.              :
Stockbridge, GA 30281,               :
                                      :
     *Defendants.*                    :
                                      :
                                      :
                                      :
                                      :

## VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs Root, Inc., Caret Holdings, Inc. ("Caret Holdings"), and Root Insurance Agency, LLC ("RIA") (together, "Plaintiffs" or "Root"), by and through their undersigned counsel, and for their Complaint against Defendants Brinson Caleb "BC" Silver ("Silver"), William Campbell ("Campbell"), Collateral Damage, LLC ("Collateral Damage"), Eclipse Home Design, LLC ("Eclipse"), Quantasy & Associates, LLC ("Quantasy"), and Paige McDaniel ("McDaniel") (collectively, "Defendants"), aver and allege as follows:

## INTRODUCTION

1.      Root is a publicly-traded technology company based in downtown Columbus, Ohio, that offers a novel, app-based approach to property and casualty insurance.

2.      Silver was Root's Chief Marketing Officer between November 2021 and November 2022. Throughout 2022, Silver, Campbell and several other co-conspirators engaged in a brazen and sophisticated scheme to defraud Root of at least $9.9 million.

3.      Root hired Silver believing he was an experienced leader and would be skilled at getting maximum value for Root's modest marketing budget for the year 2022. Silver, however, had other plans. Within days of starting his job at Root, Silver contacted Campbell to engage Campbell's company, Quantasy. Through Silver, Root contracted with Quantasy to perform marketing services for Root, and Root paid Quantasy more than $13 million. But, unbeknownst

to Root management, Silver was directing Campbell and Quantasy to transfer over $9.4 million of those payments to another company called Collateral Damage, which was owned and controlled by Silver. Silver never disclosed Collateral Damage's existence to Root management, much less the glaring conflict of interest.

4. Silver, Campbell, and the other co-conspirators executed this scheme to defraud Root and enrich themselves completely hidden from and unbeknownst to Root management, and without any authority from Root. Indeed, Root did not discover the fraud until after Silver had left the employment of Root.

5. Once the funds had been transferred to Silver via Collateral Damage, upon information and belief, Silver used the funds to purchase luxury real estate in Florida and California for and in the name of another of his companies, Eclipse.

6. By this Complaint, Plaintiffs seek damages against Silver, Campbell, Quantasy, Collateral Damage, and the other co-conspirators for their brazen acts of theft from Root.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises, in part, under the Federal Racketeer Influenced and Corrupt Organizations Act ("Federal RICO").

8. This Court has jurisdiction over Plaintiffs' related state and common law claims pursuant to the doctrine of supplemental jurisdiction under 28 U.S.C. § 1367(a) because they are all part of the same case or controversy.

9. This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between Plaintiffs and the Defendants.

10. Venue in this Court is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

11. Plaintiff Root, Inc. is an insurance holding company incorporated under the laws of Delaware with a principal place of business in Columbus, Ohio. Root, Inc. is the parent company of Caret Holdings, which is the parent company of RIA.

12. Plaintiff Caret Holdings, Inc. is incorporated under the laws of Delaware with its principal place of business in Columbus, Ohio.

13. Plaintiff Root Insurance Agency, LLC is an Ohio limited liability company with its principal place of business in Columbus, Ohio. Caret Holdings is the sole member of RIA.

14. Defendant Brinson Caleb ("BC") Silver (formerly Brinson Bernard McDaniel) is an individual that, upon information and belief, resides in both California and Florida and is a citizen of California and Florida. Silver is Root's former Chief Marketing Officer ("CMO").

15. Defendant Paige Lynette McDaniel is an individual that, upon information and belief, resides in the state of Georgia and is a citizen of Georgia. Upon information and belief, McDaniel is Silver's sister and a member of Collateral Damage.

16. Upon information and belief, Defendant Collateral Damage, LLC is a limited liability company formed under the laws of California and/or Georgia.

17. Upon information and belief, Defendant Quantasy & Associates, LLC is a limited liability company formed under the laws of Delaware with headquarters in California. Quantasy is an advertising agency in the Los Angeles area that began operating in 2012.

18.     Defendant William Campbell was during all relevant times, the Chief Executive Officer ("CEO") of Quantasy.  Upon information and belief, Campbell is an individual who resides in California and is a citizen of California.

19.     Defendant Eclipse Home Design, LLC is a limited liability company formed under the laws of Delaware with an address of 1111 Lincoln Road, Miami Beach, Florida.  Upon information and belief, Silver is the sole member of Eclipse.

## FACTS COMMON TO ALL CLAIMS

**A.      Root Hires Silver as Chief Marketing Officer.**

20.     In the summer of 2021, Root retained an executive search firm to recruit a CMO.

21.     By the fall of 2021, the executive search firm identified Silver and presented Silver to Root as a possible candidate for the position.  Ultimately, Root hired Silver.

22.     On November 8, 2021, Silver and Caret Holdings executed an executive employment agreement ("Employment Agreement").

23.     In addition to providing Silver's salary, benefits, and job responsibilities, the Employment Agreement required Silver to  "perform [his] duties, responsibilities and functions to the Company […] in a diligent, trustworthy, professional, ethical and efficient manner and [] comply with the policies and procedures of the Company[.]"

24.     Upon commencing his employment at Root, Silver signed several onboarding documents on November 16, 2021, including a Conflicts of Interest Policy.  Root's Conflicts of Interest Policy provided that: "Root expects all employees to conduct themselves and company business in a manner that reflects the highest standards of ethical conduct and in accordance with all federal, state, and local laws and regulations.  This includes avoiding real and potential conflicts of interest."

25.     Silver was employed as Root's CMO between approximately November 8, 2021 and November 9, 2022, at which point he was exited as part of a company-wide reduction in force ("RIF").

**B.    Silver Hires Quantasy to Funnel Root's Payments into His Own Company, Collateral Damage.**

26.     Upon information and belief, Silver and Campbell were previous acquaintances who had worked together prior to Silver joining Root.  On or about November 22, 2021—within two weeks of signing his Employment Agreement, conflict-of-interest documents, and starting his employment at Root—Silver sent Campbell a series of text messages.  In these initial text message exchanges, Silver and Campbell discussed Root's retaining Quantasy as a marketing vendor.

27.     On December 3, 2021, Campbell sent Silver a text message attaching a draft Scope of Work agreement ("SOW"), a true and accurate copy of which is attached hereto as **Exhibit 1**.

28.     On December 9, 2021, Campbell then sent Silver a text message containing a revised version of the SOW, a true and accurate copy of which is attached hereto as **Exhibit 1**.

29.     On January 30, 2022, Silver continued to revise the SOW via text message, a true and accurate copy of which is attached hereto as **Exhibit 2**, providing additional information for Campbell to include in the SOW.

30.     On February 3, 2022, at Silver's direction, Root signed the SOW with Quantasy ("SOW #1") with an effective date of February 1, 2022, a true and accurate copy of which is attached hereto as **Exhibit 3**.  Pursuant to SOW #1, Root was to pay Quantasy a fee of approximately $1,184,445 for "Client Partnerships"; "Brand Strategy"; and "Creative Services / Development Support."  SOW #1 provided that Root would pay approximately 40% of the outstanding amount, or $473,778.00, "upon commencement"; 35%, or $414,555.75, by February 18, 2022; and 25%, or $296,111.25, by March 1, 2022.

31.     On February 3, 2022, Quantasy invoiced Root for $473,778 (Invoice No. 2277), a true and accurate redacted copy of which is attached hereto as **Exhibit 4**.

32.     After facilitating the relationship with Quantasy, Silver and Campbell set up a scheme by which Quantasy would transfer funds to Silver's company, Collateral Damage.  On February 7, 2022, Silver sent Campbell a message using the WhatsApp messaging application, a true and accurate redacted copy of which is attached hereto as **Exhibit 5**, containing an account number and routing numbers for Collateral Damage's Bank of America bank account.  Silver included in his message that Collateral Damage had an address of "45 South Arroyo Pkwy Pasadena, Ca 91105."  No Root employee other than Silver was involved in this communication. As reflected below, when discussing Collateral Damage, Silver and Campbell almost exclusively used WhatsApp in an attempt to avoid detection.

33.     On February 9, 2022, at Silver's direction, Root paid Invoice No. 2277, via wire to Quantasy, in the amount of $473,778.  The same day, Silver sent Campbell a text message saying, "Payment went out.  Excited to have you all on the team."  A true and accurate copy of the February 9, 2022 text message is attached hereto as **Exhibit 6.**

34.     On February 11, 2022, Silver sent Campbell the first invoice for Collateral Damage via a WhatsApp message, a true and accurate copy of which is attached hereto as **Exhibit 7**.  The invoice, numbered 12012021 and dated January 29, 2020, was for $153,778 and identified Collateral Damage's purported services as "2020 Promotion Plan" and "Campaign Design Support."  The invoice contained the same routing number and accounting number for Collateral Damage that Silver had sent Campbell on February 7, 2022.

35.     Other than Silver, Root management had no knowledge of Collateral Damage's existence, that it was Silver's business, or any purported work it was performing with Quantasy for Root.

36.     Also on February 11, 2022, Silver and Campbell appear to have had an in-person meeting at Quantasy's Los Angeles offices.

37.     After their meeting and the first Collateral Damage invoice, Silver and Campbell continued discussing payment arrangements for Collateral Damage. Specifically, on February 13, 2022, via WhatsApp, Silver and Campbell discussed how the payments would be divided. As shown in Figure 1 below, Silver and Campbell discussed: (i) the percentage of each of Root's payments to Quantasy that Collateral Damage would receive; and (ii) the percentage of Root's payments to Quantasy that Quantasy would receive.

Figure 1



38.     In these WhatsApp messages, Silver explained to Campbell that Quantasy would receive $800,000 of the SOW #1 value, and that Collateral Damage would receive the remaining $384,444 of the SOW #1 value. Silver suggested that Collateral Damage's payments be split into two portions, but Campbell stated that there should be three payments to Collateral Damage and

-8-

that they should be divided up "pro rata," *i.e.* the same way that Root's payments to Quantasy were divided (40%, 35%, 25%). Silver and Campbell agreed to this division and that Collateral Damage would receive its payments totaling $384,444 in the same tranches that Quantasy received its payments from Root:  Collateral Damage would receive 40% of the total $384,444 sum in Quantasy's first payment to Collateral Damage; 35% of the total $384,444 sum in Quantasy's second payment to Collateral Damage; and the remaining 25% of the total $384,444 sum in Quantasy's third payment to Collateral Damage, just as Quantasy received 40% of the total of SOW #1 from Root upon execution; 35% of the total of SOW #1 from Root on February 18, 2022; and the remaining 25% of the total of SOW #1 from Root on March 1, 2022.

39.     On about February 14, 2022, pursuant to the payment schedule Silver and Campbell agreed to, and unbeknownst to Root management (other than Silver), Quantasy wired $153,778 to the Collateral Damage account that Silver had provided in his February 7, 2022 WhatsApp message to Campbell.

40.     On February 23, 2022, Campbell sent Root Quantasy invoice number 2286 for $414,555.75 with an already expired due date of February 18, 2022, a true and accurate redacted copy of which is attached hereto as **Exhibit 8**.

41.     On February 24, 2022, Campbell met, via videoconference, with certain members of Root management, including Silver, to present Quantasy's ideas for Root's marketing campaigns.  Following the meeting, Silver sent Campbell a text message stating, "I had to explain some things to leaders, but they finally kinda started to see the light[.]  That said, it doesn't really matter, I have autonomy to do what I need to do." A true and accurate copy of the February 24, 2022 text message is attached hereto as **Exhibit 9**.

42. On February 25, 2022, Campbell sent Silver a text message notifying him that Root had yet to pay Quantasy for Invoice No. 2286 ($414,555.75), a true and accurate copy of which is attached hereto as **Exhibit 10**.

43. On or about March 2, 2022, Campbell sent Silver a WhatsApp message, again stating that Root had yet to pay Quantasy for Invoice No. 2286, a true and accurate copy of which is attached hereto as **Exhibit 11**. Campbell wrote that Collateral Damage should send its "invoice for phase 2" so that Quantasy could "have [it] ready" once Quantasy received Root's next payment. Campbell wrote that Silver should have "Lauren…send the next one." Upon information and belief, Campbell and Silver are referring to non-party Lauren Lanskie and the "next one" was the second invoice from Collateral Damage.

44. Lauren Lanskie ("Lanskie"), a non-party to this action, previously worked for Collateral Damage as Silver's assistant for three months beginning in or about November 2019. Ms. Lanskie quit in February 2020 because she was not receiving her agreed-upon pay from Silver.

45. In 2022, Ms. Lanskie was not working for Collateral Damage or Silver and had no contact with Silver. Upon information and belief, Silver used Lanskie's Collateral Damage email address on multiple occasions to impersonate her and steal her identity. Silver did this in an attempt to cover the tracks of the scheme he perpetrated on Root.

46. On March 4, 2022, Campbell sent Silver a text message notifying him again that Quantasy had still not received payment from Root for Invoice No. 2286. A true and accurate copy of the March 4, 2022 text message is attached hereto as **Exhibit 12.**

47. On March 7, 2022, at Silver's direction, Root wired Quantasy $414,555.75 for payment of Invoice No. 2286.

48.     After receiving Root's payment on March 8, 2022, Campbell sent a text message to Silver on March 9, 2022, notifying Silver that Root's payment had been received. A true and accurate copy of the March 9, 2022 text message is attached hereto as **Exhibit 13.** Campbell again told Silver (via a WhatsApp message) that he had not "receive[d] anything from Lauren." Campbell asked Silver to "resend" Collateral Damage's invoice, and assured Silver that "[o]ur team can handle right away." But again, Lanskie was not employed by Collateral Damage at this time.

49.     In response to this WhatsApp message, Silver sent Campbell Collateral Damage's second invoice, a true and accurate copy of which is attached hereto as **Exhibit 14**. This invoice, numbered 12022021, was for $134,555.75; included an invoice date of February 27, 2022 and a due date of March 1, 2022; and included as services "2021 Promotion Plan" and "Campaign Design Support." On March 9, 2022, unbeknownst to Root management (other than Silver), Quantasy wired Collateral Damage $134,555.75 to the bank account that Silver had provided Campbell on February 7, 2022.

50.     On March 16, 2022, Silver sent Campbell a text message instructing Campbell to only direct invoices to Silver in the future. Specifically Silver wrote that Individual A, Silver's direct marketing report at Root, was no longer authorized to approve Quantasy invoices and that invoices should be routed through him instead: "Send to just invoices and me[.] No longer [Individual A]. She no longer approves invoices." Campbell responded, "Uh oh. Did she get in trouble? You were not playing." Silver wrote back: "Yes. I can't have our vendors not being paid on time." But Individual A was not "in trouble." Rather she was only removed from the communication between Campbell and Root by Silver to ensure that she did not discover Silver

and Campbell's scheme.  A true and accurate redacted copy of the March 16, 2022 text message exchange is attached hereto as **Exhibit 15.**

51.     On March 17, 2022, Quantasy sent Root invoice number 2303 for $296,111.25, a true and accurate copy of which is attached hereto as **Exhibit 16**.  This invoice was dated March 1, 2022 with a due date of March 1, 2022.

52.     On March 24, 2022, at Silver's direction, Root wired Quantasy $296,111.25 in payment of invoice 2303.

53.     The next day, on March 25, 2022, Silver sent Campbell a WhatsApp message alerting him that Quantasy "should have received the payment today."  Campbell responded, "[c]onfirmed" and "[p]lease have Lauren send an invoice."  Silver responded to Campbell that Lauren "sent the invoice."  This was false, "Lauren" (i.e. Lanskie) was no longer an employee of Collateral Damage or Silver.  Upon information and belief, Silver improperly used Lanskie's former Collateral Damage email address to send the email and he signed the email with Lanskie's electronic signature.  A true and accurate copy of the March 25, 2022 WhatsApp exchange is attached hereto as **Exhibit 17**.

54.     That same day, Campbell received an email from "Lauren Lanskie" attaching Collateral Damage invoice number 03012021 dated March 1, 2022, for $96,111.25, a true and accurate copy of which is attached hereto as **Exhibit 18.**  Upon information and belief, Silver improperly used Lanskie's former Collateral Damage email address and electronic signature to send that email.

55.     On March 28, 2022, unbeknownst to Root management (other than Silver), Quantasy wired Collateral Damage $96,111.25 to the bank account that Silver had provided Campbell on February 7, 2022.

56.     In total, pursuant to the February 13, 2022 WhatsApp arrangement between Silver and Campbell on behalf of Collateral Damage and Quantasy, Quantasy was paid a total of $1,184,444 from Root.  And Quantasy secretly transferred $384,444 of that amount to Collateral Damage.  Throughout this period, Root management was unaware of Collateral Damage, or that it was Silver's company, and had no knowledge that Quantasy was paying Collateral Damage out of the money paid to Quantasy by Root.  Root management received no documents or other materials from Collateral Damage to substantiate the $384,444 fee it received and, upon information and belief, Root received no value for the $384,444 that was paid by Quantasy to Collateral Damage.

### C.     Silver and Campbell Continue To Defraud Root.

57.     At some point after April 1, 2022, Silver caused Root to enter into a second Scope of Work ("SOW #2") with Quantasy valued at $14.7 million, a true and accurate copy of which is attached hereto as **Exhibit 19**.  SOW #2 included an effective date of February 1, 2022 and provided that Root would pay Quantasy $7,350,000 by April 1, 2022, and another $7,350,000 by April 15, 2022.  Campbell signed SOW #2 on behalf of Quantasy and Silver signed on behalf of Root.

58.     On April 1, 2022, Campbell sent an email to Silver and Root's invoicing department attaching two Quantasy invoices:  invoice number 2307 for $3,450,000, and invoice number 2308 for $3,900,000, for a total of $7,350,000.  Both invoices were due "on receipt."  True and accurate copies of the invoices are attached hereto as **Exhibits 20 and 21**.

59.     On April 4, 2022, Root wired to Quantasy, at Silver's direction, a total of $7,350,000 as payment for invoices 2307 and 2308.

60.     The next day, April 5, 2022, Silver sent Campbell a WhatsApp message telling Campbell that "[p]ayments were sent out yesterday" and telling Campbell to "[l]et me know when

you receive" because Silver will "have Lauren forward the invoice this morning." But Lanskie was not employed by Collateral Damage. A true and accurate copy of the April 5, 2022 WhatsApp message is attached hereto as **Exhibit 22.**

61.     On or about April 6, 2022, Campbell sent an email to Silver's private email account, "hello@bc-silver.com," informing Silver that Quantasy had already "started putting together a subcontracting agreement between Quantasy and ***your company***, Collateral Damage." Campbell stated that Quantasy's attorney had "reminded" Campbell that "the advertising industry, especially the leading brands (both individually and through the ANA) have been very focused on the issues of subcontracting with ***interested parties*** and payments to agencies that include payments to third parties." Campbell advised Silver that Quantasy's attorneys "recommend[] . . . that the relationship between Quantasy and Collateral damage be approved by Root." Campbell suggested that "[t]his can be done by having simple approval language in the subcontracting agreement between Collateral Damage and Quantasy. It can also be done by way of a separate document between Root and Quantasy that authorizes the subcontracting relationship, services provided, etc. The approval can be signed by someone in Root's procurement, finance or legal." A true and accurate copy of the April 6, 2022 email is attached hereto as **Exhibit 23.**

62.     This after-the-fact attempt to "formalize" an agreement between Quantasy and Collateral Damage with Root's purported approval was a further attempt to hide from Root the misdeeds being perpetrated by defendants Silver, Quantasy, Campbell and Collateral Damage. In any event, no such authorization or approval by Root ever occurred. At no point did Silver disclose his affiliation with Collateral Damage—or Collateral Damage's existence, much less any work Collateral Damage was purportedly doing for Root or Quantasy—to other members of Root management.

63.     On or about April 7, 2022, Silver sent a WhatsApp message to Campbell that Silver had been "completely removed from any previous ownership of CD." A true and accurate copy of the April 7, 2022 WhatsApp message is attached hereto as **Exhibit 24.**

64.     Upon information and belief, on or about April 11, 2022, Silver and McDaniel, a convicted and sentenced felon in Georgia for mortgage fraud, caused a certificate of organization for Collateral Damage to be filed with the Georgia Secretary of State, a true and accurate copy of which is attached hereto as **Exhibit 25**. The certificate of organization was signed by McDaniel, who, upon information and belief, is Silver's sister, and was an additional attempt to hide Collateral Damage and its affiliation with Silver.

65.     But despite the Georgia registration and his claim that he was "completely removed" from ownership of Collateral Damage, Silver registered Collateral Damage as a California LLC in his own name, on or around May 10, 2022. A true and accurate copy of the California registration is attached hereto as **Exhibit 26.** The address given for Collateral Damage on the California registration in Pasadena, California matches the address on Collateral Damage's invoices to Quantasy and the address for Collateral Damage provided by Silver to Campbell on February 7, 2022.

66.     Far from distancing himself from Collateral Damage, beginning in mid-April 2022, Silver's contact with Campbell regarding the timing of payments to Collateral Damage became more urgent and aggressive. On April 11, 2022, Silver began questioning Campbell about when Collateral Damage would be paid by Quantasy over a series of WhatsApp messages, first asking: "What is the latest on transfer? Did it go out Friday or this morning? They said it has not arrived yet. Maybe it's weekend processing, so it will hit tomorrow." A true and accurate copy of the April 11, 2022 WhatsApp exchange is attached hereto as **Exhibit 27.** That same day, unbeknownst

to Root management (other than Silver), Quantasy wired Collateral Damage $500,000. Two days later, on April 13, 2022, again unbeknownst to Root management (other than Silver), Quantasy wired Collateral Damage another $500,000.

67. On April 14, 2022, Silver sent Campbell a WhatsApp message outlining specific directions to follow when creating and sending invoices to Root, a true and accurate copy of which is attached hereto as **Exhibit 28**. Silver instructed that they should "make sure invoices are less than $10M . . . [s]o they don't need board approval."

68. Later that same day, on April 14, 2022, Campbell sent Root's invoicing department an email message attaching two Quantasy invoices: invoice number 2316 for $3,450,000, and invoice number 2317 for $3,900,000, for a total of $7,350,000. A true and accurate copy of the April 14, 2022 email is attached hereto as **Exhibit 29.**

69. On April 15, 2022, Quantasy wired Collateral Damage another $500,000. Five days later, on April 20, 2022, Quantasy wired Collateral Damage an additional $1,300,000. As of April 20, 2022, Quantasy had paid Collateral Damage $2.8 million from the funds that Root had paid Quantasy under SOW #2. Root management (other than Silver) was unaware of any of these payments to Collateral Damage.

70. On April 25, 2022, Root, at Silver's direction, wired Quantasy $7,350,000 in payment of invoices 2316 and 2317.

71. On April 27, 2022, Lanskie purportedly sent an email to Campbell attaching a W-9 tax form for Collateral Damage. A true and accurate copy of the April 27, 2022 email is attached hereto as **Exhibit 30.** Upon information and belief, Silver improperly used Lanskie's former Collateral Damage email address and electronic signature to send that email. The W-9

form was electronically signed by "Paige Lynette" who, upon information and belief, is Paige Lynette McDaniel, Silver's sister.

72.     The April 27, 2022 email also attached Collateral Damage's invoice 04152021 for $5.6 million, with an April 15, 2022 due date.  The invoice states that Collateral Damage will "implement a sports marketing program integrating athletes and sports organizations . . . for Root Insurance in support of national awareness with an additional regional two-state focus in Colorado and Oklahoma."  Root management (other than Silver) was not aware of any, nor did it ever receive any, sports marketing program from Collateral Damage or Quantasy.

73.     On April 27, 2022, Quantasy wired $1.5 million to the Collateral Damage bank account that Silver had provided to Campbell.

74.     The next day, April 28, 2022, Quantasy wired a total of $1.3 million to that same account.  Root management (other than Silver) was unaware of any of these payments to Collateral Damage.

75.     Between April 27, 2022 and May 17, 2022, Silver continued to message Campbell on WhatsApp about the timing of the remaining wire payments from Quantasy to Collateral Damage.  Silver was persistent in sending these types of messages throughout April and May to ensure that Collateral Damage was receiving its portion of Root's money.  A true and accurate copy of the WhatsApp exchanges is attached hereto as **Exhibit 31.**

76.     On May 11, 2022, Silver sent a WhatsApp message to Campbell stating:  "Ideal deployment schedule" for Quantasy's wires to Collateral Damage:  "Wire May 11 - $500k[;] May 12 - $500k[;] May 13 - $500k ACH[;] May 11 - $2M (Scheduled) arrival by May 13."  That message is shown in Figure 2 below:

Figure 2



77.     Also on May 11, 2022, and as shown below, Campbell received an email from Lanskie's Collateral Damage email address attaching Collateral Damage invoice number 05092022 for $3.5 million with a due date of May 10, 2022, a true and accurate copy of which is attached hereto as **Exhibit 32**.  Upon information and belief, Silver improperly used Lanskie's former Collateral Damage email address to send that email.  Indeed, although the email attaching the invoice is from "lauren@collateraldamage.agency" the message is signed by "BC," (i.e. Silver).  Further, the email footer reads "Accounts Payable" and, upon information and belief, Lanskie was never in "Accounts Payable" nor was there an "Accounts Payable" function at Collateral Damage when Lanskie worked there.

Figure 3



> **To:**      Will Campbell[will@quantasy.com]
> **From:**    Lauren Lanskie[lauren@collateraldamage.agency]
> **Sent:**    Wed 5/11/2022 4:10:30 AM (UTC)
> **Subject:** Quantasy May 10 Invoice
> Quantasy Invoice - May 10 2022.pdf
>
> Hello Will,
> Attached is the May 10th invoice. Have a great evening.
>
> Thanks
> BC
>
> --
> **Lauren Lanskie**  |  Accounts Payable  |  www.CollateralDamage.agency

78.     As with Collateral Damage invoice 04152021, invoice 05092022 states that Collateral Damage will "implement a sports marketing program integrating athletes and sports organizations . . . to active for brand clients.  In support of national awareness with an additional regional and national executions."  Root management (other than Silver) was never aware of any sports marketing program that was to be implemented by Collateral Damage or Quantasy.

79.     On May 11, 2022, Quantasy wired $500,000 to the Collateral Damage bank account that Silver had provided Campbell on February 7, 2022.  Root management (other than Silver) was unaware of this payment to Collateral Damage.

80.     On or about May 12, 2022, Silver sent Campbell a WhatsApp message, telling Campbell that "the team said they didn't see the second wire today" and asking Campbell if he could be put in direct contact with whoever is sending the money from Quantasy so that Silver did not need to "bother[]" Campbell further about the payments to Collateral Damage.  A true and accurate copy of the May 12, 2022 WhatsApp exchange is attached hereto as **Exhibit 33.**

81.    The next day, on May 13, 2022, Quantasy sent two additional wires for $500,000 each to the Collateral Damage bank account.  Root management (other than Silver) was unaware of any of these payments to Collateral Damage.

82.    On May 16, 2022, Silver sent WhatsApp messages with even more heightened urgency to Campbell, telling Campbell that "[s]ame day wires should be used for today's completion" and that "[w]hatever that comes in beyond the $2M will be returned to Quantasy within 24 hours."  Silver told Campbell that in order to get the money as quickly as possible, "my team will just walk into the physical branch to schedule a transfer" and that "my team will also update me the moment the[y] see it reflected on their side."  Silver also said that the money was "supposed to make it into the account last week on Friday, but it never arrived."  A true and accurate copy of the May 16, 2022 WhatsApp exchange is attached hereto as **Exhibit 34**.  That same day, Quantasy wired an additional $500,000 to the Collateral Damage account.  Root management (other than Silver) was unaware of this payment to Collateral Damage.

83.    On May 17, 2022, as reflected in Figures 4-6 below, Silver sent increasingly desperate messages to Campbell requesting that Campbell urgently transfer funds to Collateral Damage, telling Campbell that "this is major for me today, in the next hour" and "please . . . send over final confirmation in the next hour."  When Campbell responded that his employees were busy with work on another account, Silver told Campbell:  "I thought we had a good plan ahead of schedule, but I understand things get confusing.  Please have him Hope [sic] out they are a bit under the gun on an acquisition."  Silver then sent Campbell a screenshot of Silver's text message conversation with a third party with the initial "K" stating that, "Maria is stalling as much as she can, but if seller asks if she has the money in escrow, she cannot lie.  As you know, legally wire should have been there yesterday.  We've been able to stall due to this delay on the lien/permit

(title) search. However, if the search gets back before wire is received we're in breach of contract."

(Figure 5). Later that same day, Campbell sent Silver a photograph of Campbell standing in front of Chase bank, indicating the final wire transfer was completed, to which Silver responded: "That's my dawg. Send confirmation once you have it." Root management (other than Silver) were unaware of these communications between Silver and Campbell.

Figure 4



## Figure 5



## Figure 6



84.     On May 17, 2022, Quantasy wired a total of $1.5 million to Collateral Damage.

85.     In total, Quantasy was paid $14,700,000 from Root related to SOW #2 and, of that amount, Quantasy transferred $9,100,000 to Collateral Damage.  Throughout this period, Root management (other than Silver) was unaware of Collateral Damage, or that Collateral Damage was Silver's company, and had no knowledge that Quantasy was paying Collateral Damage from the money Root paid to Quantasy.  Root management (other than Silver) received no documents or other materials from Collateral Damage to substantiate the $9,100,000 fee it received and, upon information and belief, Root received no value for the $9,100,000 that was paid by Quantasy to Collateral Damage.

86.     On information and belief, Silver used the funds wired to Collateral Damage to make various purchases.  Between April 2022 and August 2022, Silver purchased at least three high-end residential properties in Miami, Florida, and Venice, California, totaling in excess of $10 million.  Upon information and belief, Silver's real estate purchases were funded, at least in part, by the money Quantasy wired to Collateral Damage.  In order to conceal his ownership of the properties, Silver purchased these properties using Eclipse, which, upon information and belief, is a limited liability company owned and controlled by Silver.

87.     While all three home purchases occurred around the time of Quantasy's fraudulent transfer of over $9.4 million to Collateral Damage, one of Eclipse's (Silver's) purchases lines up precisely with the timing of Silver's frantic messages to Campbell in Figures 4-6 above.  On May 13, 2022, a warranty deed was conveyed to Eclipse for a property located at 13105 Biscayne Island Terrace, Miami Shores, Florida, 33181.  The warranty deed contains a re-occupancy certificate signed by Silver.  The mortgage on the property was recorded on June 27, 2022 for $1,195,000, and is also signed by Silver as Eclipse's "Managing Member."

88. According to the Zillow real estate website, 13105 Biscayne Island Terrace is a waterfront property that sold for $3,250,000 on May 18, 2022, the day after Silver's frantic messages to Campbell. Figure 7 below is a publicly available picture of the 13105 Biscayne Island Terrace property.

Figure 7



89. A month earlier, on April 28, 2022, Eclipse was conveyed another property in Miami Dade County by deed. The April property has a Parcel Identification Number of 11-3205-001-0590, which publicly available records indicate is a property located at 9125 North Bayshore Drive. Silver, acting as Eclipse's "Managing Member," is the signatory for a $2,275,000 mortgage on the 9125 North Bayshore Drive property.

90. According to the Zillow website, 9125 North Bayshore Drive is a waterfront property that sold for $4,350,000 on April 28, 2022. Figure 8 is a publicly available picture of the 9125 North Bayshore Drive property.

Figure 8



91.     On August 2, 2022, a mortgage of $1,932,000 was recorded on a property at 2543 Walnut Avenue, Venice, California 90291.  The mortgage was signed by Silver as a "Managing Member" of Eclipse.  According to Zillow, 2543 Walnut Avenue sold on August 2, 2022 for $3,295,000.  Figure 9 is a publicly available picture of the 2543 Walnut Avenue property.

Figure 9



### D.     Silver and Campbell Attempt to Further Cover Up Their Fraud.

92.     In or about June and July 2022, Root's Finance Department became aware of unplanned spending from the marketing department and began investigating the cause of the overage.

93.     Aware of this heightened scrutiny, Silver and Campbell issued a series of change orders in an attempt to cover their tracks, true and accurate copies of which are attached hereto as **Exhibits 35**.  Among other things, the change orders stated that the money that Root had already paid Quantasy pursuant to SOW #2, and that Quantasy had already paid (unbeknownst to Root) to Collateral Damage, constituted Root's "prepaid funds" that were available for future spend.  With the exception of the February 24, 2022 presentation to Root management, which provided no actual marketing or advertising for Root and for which Quantasy charged Root a staggering $1.2 million dollars, Quantasy provided little in the way of services to Root.  Rather the "value" enjoyed was by windfall to Quantasy for services not provided and by Silver who now enjoyed the benefits of owning three multi-million dollar properties purchased with Root's funds.

94.     On July 25, 2022, at Root's request and urging, Quantasy agreed to return $1.2 million from SOW #2 to Root, bringing SOW #2's new value down from $14.7 million to $13.5 million. This agreement had an effective date of July 5, 2022.  Root received this $1.2 million refund via wire payment on August 26, 2022.  Silver conducted all communications with Quantasy related to the $1.2 million himself, without involvement by others at Root, and at no time did Quantasy disclose to anyone at Root that the majority of the $14.7 million was actually not held by Quantasy at all, but had been transferred to Silver's company months earlier and then spent by Silver on his luxury coastal homes.

95.     In late July 2022, Root initiated an internal audit to fully investigate and determine the cause of the suspiciously high marketing spend.  Root was particularly interested in investigating Root's relationship with Quantasy, as the money paid to Quantasy represented the bulk of the increased marketing expense.  At this point, Root management (other than Silver) was still unaware of the payments made by Quantasy to Collateral Damage.

96.     On August 20, 2022, Quantasy and Collateral Damage entered into an after-the-fact subcontractor agreement, with an effective date of February 2, 2022, a true and accurate copy of which is attached hereto as **Exhibit 36**.  "Paige Lynette" appears as signatory for Collateral Damage as "President," and Campbell signed on behalf of Quantasy.

97.     On or around August 22, 2022, Root's internal audit team questioned Campbell directly about Quantasy's work for Root to determine whether there was justification for the millions of dollars Root had paid to Quantasy.  Loyal to Silver and their scheme, Campbell lied to Root and never disclosed that, in fact, the majority of Root's payments had been funneled to Collateral Damage.

98.     Quantasy not only omitted crucial information about Collateral Damage during the course of Root's audit, but also explicitly misrepresented that Root's spend with Quantasy was still available to be reallocated and spent in 2023.  On September 22, 2022, Quantasy employee David Rodriguez confirmed to Root's internal audit team that $10.7 million of the $14.7 million original spend was "currently unallocated/ uncommitted at this time."  Rodriguez responded to an email from a member of the Root team working on the internal audit that "[y]es, the $10.7M can be used for paid media in 2023."  A true and accurate copy of the September 22 email is attached hereto as **Exhibit 37.**  This was, of course, not true, as $9.1 million of the $10.7 million was already paid to Collateral Damage.

99. On August 22 and August 23, 2022, Silver sent Campbell WhatsApp messages containing screenshots of Root's confidential communications and internal audit findings, which did not uncover Silver and Campbell's carefully concealed fraud. Silver wrote, "we literally are good. *I just need for you to trust me and hold the line.*" True and accurate copies of the August 22 and August 23 WhatsApp messages are attached hereto as **Exhibits 38 and 39.**

100. On September 29, 2022, Quantasy purported to "assign" the August 20, 2022 subcontractor agreement between Quantasy and Collateral Damage to Root, a true and accurate copy of which is attached hereto as **Exhibit 40**. The only signatory on the assignment from Root was Silver; other members of Root management had no knowledge of the assignment.

101. On November 9, 2022, Silver's last day at Root, Silver purported to email Lanskie asking Lanskie to provide Silver with all the purported agreements between Collateral Damage and Root. Silver received a response from Lanskie's email address, a true and accurate copy of which is attached hereto as **Exhibit 41**. Upon information and belief, Silver improperly used Lanskie's former Collateral Damage email address to send that email as Lanskie had not been a Collateral Damage employee for over two years. Upon information and belief, the agreements were not in Root's possession before this November 9, 2022 email, and, upon information and belief, they were fabricated by Silver.

102. The email purportedly from Lanskie attached three supposed agreements between Collateral Damage and Root, all signed only by Silver and Lanskie. Upon information and belief, Silver forged Lanskie's signature on all three documents. The agreements consisted of: (i) an SOW between Root and Collateral Damage; (ii) a subcontractor agreement between Root and Collateral Damage; and (iii) a Client Media Authorization ("CMA") between Root and Collateral Damage. Silver is the only Root signatory on any of the agreements.

a. The SOW notes that Collateral Damage will move all "H2 Marketing Plans to January 2023" and that the "remaining budget will be leveraged next year." This remaining budget is $9.1 million, which is the amount Quantasy sent Collateral Damage on SOW #2. This SOW is signed by Silver and Lanskie on behalf of Collateral Damage (but Lanskie's name is misspelled as "Lanski"). Lanskie's title is "Principal." Upon information and belief, Silver forged Lanskie's signature on this agreement; Lanskie did not work for Collateral Damage in 2022, and was never a "Principal."

b. The subcontractor agreement, which is dated October 4, 2022, between Root and Collateral Damage, sets forth that Root would engage Collateral Damage as a subcontractor for the provision of "strategy, branding, media and production services." This agreement was also signed by Silver and Lanskie, with Lanskie's name again misspelled as "Lanski" and her title given as "Officer." Upon information and belief, no such services have ever been provided by Collateral Damage to Root. Upon information and belief, Silver also forged Lanskie's name and signature on this agreement. Lanskie did not work for Collateral Damage in 2022, and was never an "Officer."

c. The CMA was purportedly entered into between Root and Collateral Damage on October 10, 2022 by Silver and Lanskie, identifying services totaling $9.1 million. Lanskie's name is again misspelled as "Lanski" and she is falsely listed in this document as the "Principal/Owner" of Collateral Damage. The CMA contains an "Estimated Budget" by partner purporting to divide the $9.1 million into three categories: "ESPN" ($2,222,222),

"Barstool Sports" ($4,370,629) and "iHeart" ($2,507,142). Upon information and belief, no work was done or contemplated with these entities on Root's behalf. Upon information and belief, Silver forged Lanskie's name and signature on this agreement. Lanskie did not work for Collateral Damage in 2022, and was never a "Principal/Owner."

103. On November 16, 2022, following Silver's departure from the company, Root executives met virtually with David Rodriguez at Quantasy to engage in further discussions about clawing back the $10.7 million that Quantasy was purportedly holding for Root to spend on marketing initiatives in 2023. Not surprisingly, Campbell refused to attend the meeting. During this meeting, Rodriguez disclosed to Root management, for the first time, the existence of Collateral Damage. Rodriguez also told Root management that payments had been made to Collateral Damage using Root's funds. Rodriguez stated that he would be "overly transparent," and disclosed that Quantasy itself held approximately $1.6 million that could potentially be returned from the $10.7 million outstanding, but that the other $9.1 million had been transferred, immediately upon Quantasy's receipt from Root, to Collateral Damage. This was the first time Root management (other than Silver) learned of Collateral Damage or that the money Root provided Quantasy had been transferred to Collateral Damage.

104. Following the conversation with Rodriguez, Root asked Silver about the newly-discovered subcontractor and Silver refused to have substantive discussions with Root over the phone, insisting that he would only respond to questions by email. Root's general counsel subsequently sent Silver an email to which Silver responded on November 22, 2022 and made numerous misstatements and omissions, including stating that Quantasy had full control over who they chose to work with, that Collateral Damage was hired to perform sports and gaming marketing

services, and also provided false contact information for the company, including identifying "Lauren" as the contact person.  Silver did not disclose the true nature of Collateral Damage or his own affiliation with the company.  A true and accurate copy of the November 22, 2022 email exchange is attached hereto as **Exhibit 42.**

> **E.     Silver Committed Fraudulent Schemes Against Root with Other Marketing Vendors.**

105.     Root is continuing to investigate the various vendors that Mr. Silver used while at Root.  Root has recently been made aware of at least one other vendor that transferred funds paid by Root at Silver's direction to Collateral Damage.  After receiving payments from Root for marketing services, Ben-Her Marketing ("Ben-Her") transferred $502,999.86 to Collateral Damage at Silver's direction.  Root is continuing to investigate these payments.

## COUNT I: 18 U.S.C. § 1962(c) Civil RICO
### (Racketeer Influenced Corrupt Organizations) Against All Defendants

106.     Plaintiffs restate the foregoing paragraphs as if fully rewritten herein.

107.     Defendants are individuals and/or entities capable of holding a legal or beneficial interest in property, within the meaning of "person" as defined in 18 U.S.C. § 1961(3).

108.     Defendants constitute an association in fact under the meaning of "enterprise" as defined in 18 U.S.C. § 1961(4).  Additionally or alternatively, Collateral Damage and Eclipse constitute an "enterprise" under 18 U.S.C. § 1961(4).

109.     Defendants associated together as an enterprise for the purpose of executing a scheme to defraud Plaintiffs through a pattern of racketeering consisting of distinct acts of wire fraud and money laundering in violation of 18 U.S.C. §§ 1343 and 1956.

110.     Silver participated in the enterprise by, among other things: devising and participating in a scheme with Defendants Campbell, McDaniel, Quantasy, Collateral Damage, and Eclipse designed to defraud Root of funds through a series of false transactions resulting in

Root's funds being transferred (through Quantasy) to Silver's own company, Collateral Damage. Silver further participated in the enterprise by: actively concealing and failing to disclose the existence of Collateral Damage and Silver's affiliation with Collateral Damage to Root management; utilizing Collateral Damage to submit false invoices to Quantasy for services not rendered, nor ever rendered, for Root's benefit, but rather for his own personal gain; filing corporate registration documents for Collateral Damage in California and causing a certificate of organization for Collateral Damage to be filed with the Georgia Secretary of State in an attempt to conceal Silver's affiliation with Collateral Damage from Root; creating and causing to be created false invoices, emails, contracts and subcontracts to further the scheme; forging Lanskie's name on documents; abusing his authority at Root by causing the payment of Root funds to Collateral Damage through Quantasy that were ultimately for his personal gain; and using the ill-gotten funds received from Root through Quantasy and Collateral Damage for his personal benefit, including the purchase of luxury homes in California and Florida.

111. Campbell participated in the enterprise by, among other things, devising and participating in a scheme with Defendants Silver, McDaniel, Quantasy, Collateral Damage, and Eclipse designed to defraud Root of funds through a series of false transactions resulting in Root's funds being transferred (through Quantasy) to Silver's own company, Collateral Damage; accepting the payment of funds from Root for services not rendered; representing to Root that Quantasy had provided services to Root when it had not; failing to disclose the existence of Collateral Damage and its affiliation with Silver to Root; utilizing Quantasy to submit false invoices to Root for services not rendered, nor ever rendered, for Root's benefit; knowingly paying funds received by Quantasy from Root over to Collateral Damage for services not rendered, nor

ever rendered, for Root's benefit; and creating false invoices, contracts, purported work product and subcontracts to further the scheme.

112.   Quantasy participated in the enterprise by participating in a scheme with Defendants Silver, Campbell, McDaniel, Collateral Damage, and Eclipse designed to defraud Root of funds through a series of false transactions claiming that Quantasy and Collateral Damage had provided services to Root when they had not and resulting in Root's funds being secretly transferred (through Quantasy) to Collateral Damage; accepting the payment of funds from Root for services not rendered; failing to disclose the existence of Collateral Damage and its affiliation with Silver to Root; submitting false invoices to Root for services not rendered, nor ever rendered, by Quantasy for Root's benefit; knowingly paying funds received by Quantasy from Root to Collateral Damage for services not rendered, nor ever rendered, for Root's benefit; and creating false invoices, contracts, purported work product and subcontracts to further the scheme.

113.   Collateral Damage participated in the enterprise by among other things: participating in a scheme with Silver, Campbell, McDaniel, Quantasy, and Eclipse designed to defraud Root of funds through a series of false transactions claiming that Collateral Damage had provided services to Root when it had not and resulting in Root's funds being secretly transferred (through Quantasy) to Collateral Damage; accepting the payment of funds from Quantasy for services not rendered; submitting false invoices to Quantasy for services not rendered, nor ever rendered, for Root's benefit, but rather solely for the personal gain of the co-conspirators, including Silver; creating false paperwork, including but not limited to invoices, contracts and subcontracts to further the scheme; and ultimately disbursing the ill-gotten funds received from Root through Quantasy for the sole benefit of its principals and employees, including Silver, McDaniel, and Williams.

114.     McDaniel, through her association with Collateral Damage, participated in the enterprise by among other things: participating in a scheme with Silver, Campbell, Collateral Damage, Quantasy, and Eclipse designed to defraud Root of funds through a series of false transactions claiming that Collateral Damage had provided services to Root when it had not and resulting in Root's funds being secretly transferred (through Quantasy) to Collateral Damage; and causing a certificate of organization for Collateral Damage to be filed with the Georgia Secretary of State in an attempt to conceal Silver's affiliation with Collateral Damage from Root.

115.     Eclipse, which is owned and controlled by Silver, upon information and belief, participated in the scheme and knew of the fraud through Silver and ultimately received the ill-gotten funds from Root through Quantasy and Collateral Damage.  Eclipse (through Silver) then utilized the funds, in whole or in part, to purchase luxury real estate in California and Florida.

116.     Upon information and belief, Defendants used the same or similar methods described above to channel funds through other marketing entities besides Quantasy.  So far, Root is aware that Ben-Her, another company hired to perform marketing services for Root, transferred a total of $502,999.86 of Root's funds to Collateral Damage at Silver's direction while Silver was Root's CMO.

117.     Defendants' scheme to defraud Plaintiffs injured Plaintiffs in an amount greater than $9.9 million.

### COUNT II: Fraudulent Concealment
### Against Silver, Campbell, and Quantasy

118.     Plaintiffs restate the foregoing paragraphs as if fully rewritten herein.

119.     As Root's CMO, Silver had a duty to disclose the following known material information to Root:  Collateral Damage is owned, controlled, and/or otherwise affiliated with Silver and/or an immediate family member; Quantasy and Ben-Her transferred funds received

from Root to Collateral Damage; Silver acted on Collateral Damage's behalf to negotiate and facilitate the payments from Quantasy and Ben-Her to Collateral Damage; some or all of the funds that were transferred to Collateral Damage from Quantasy and Ben-Her were not used for Root's benefit, but were, upon information and belief, transferred to another entity owned by Silver (Eclipse) and used to purchase real estate. This information was material to Root's business relationship with Quantasy and Ben-Her because Root would not have entered into business relationships with Quantasy and Ben-Her with this knowledge.

120. As a party to the business transaction between Root and Quantasy, Campbell and Quantasy had a duty to disclose to Root, among other things, the following: Quantasy's intent to subcontract marketing work for Root to Collateral Damage; Quantasy's intent to work out a private payment structure with Silver that was not disclosed to anyone else at Root; that instead of performing marketing work for Root, Quantasy and Campbell were channeling funds to Collateral Damage even though Collateral Damage was not performing marketing services. This information was material to Root's business relationship with Quantasy because Root would not have entered into a business relationship with Quantasy with this knowledge.

121. Silver, Campbell, and Quantasy intentionally concealed the above material information from Root in order to induce Root into entering a business relationship with Quantasy and paying Quantasy at least $9.4 million for services that were never rendered.

122. Root justifiably relied on Silver, Campbell, and Quantasy in entering the business relationship with Quantasy and Ben-Her because it had no knowledge of the private agreements between the Defendants to defraud it and could not have obtained that knowledge absent Defendants' confessions.

123.    As a result of Silver, Campbell, and Quantasy's concealment of material facts concerning the transaction, Root suffered damages in an amount greater than $9.9 million.

### COUNT III: Fraudulent Misrepresentation
### Against Silver, Campbell, and Quantasy

124.    Plaintiffs restate the foregoing paragraphs as if fully rewritten herein.

125.    On information and belief, Defendants Campbell, Quantasy, and Silver made material misrepresentations during the February 24, 2022 presentation by Quantasy regarding the work that Quantasy intended to do for Root.  At that time, Campbell and Quantasy already had an under-the-table deal with Silver for Quantasy and/or Collateral Damage to receive funds from Root without rendering services.

126.    Silver, Campbell, and Quantasy made material misrepresentations to Root concerning the transaction between Root and Quantasy by claiming that the money Root had already paid Quantasy constituted "prepaid funds" that were available for future spend in 2023. On September 22, 2022, David Rodriguez confirmed to Root's internal audit team that $10.7 million of the $14.7 million original spend was "currently unallocated/ uncommitted at this time" and could be used for paid media.  In reality, at least $9.1 million of these funds were already transferred to Collateral Damage.

127.    On information and belief, Campbell and Quantasy made material misrepresentations to the Root internal audit team in August 2022.  Campbell told Root that Quantasy had done work for Root that justified the value of what Root paid Quantasy, when, in fact, Quantasy had transferred the majority of the funds to Collateral Damage.  Campbell acted in his own capacity (and as a representative of Quantasy) when he was interviewed by Root's internal audit team.

128.    When questioned about Collateral Damage by Root management, Silver made material misrepresentations to Root.  On November 22, 2022, Silver emailed Root's general counsel and stated that Silver introduced Quantasy to Collateral Damage to help with sports marketing and gaming support.  Silver further stated that Quantasy had full control over who it selected as subcontractor.  Silver identified "Lauren" as the current contact at Collateral Damage and provided false contact information.  Silver informed Root's general counsel that this was all of the information he could provide Root about Collateral Damage.  Silver's own counsel repeated Silver's misrepresentations to Root's general counsel on December 1, 2022.

129.    Silver made material representations to Root by creating and sending Root fabricated and backdated agreements purportedly between Root and Collateral Damage in order to cover up his and the other co-conspirators' scheme.  Silver forged Lanskie's signature on the agreements, which are replete with errors and include false statements of Lanskie's title and authority to enter into the agreements, e.g., characterizing her as "principal" when in fact Lanskie was not even employed by Collateral Damage at this point.

130.    Silver, Campbell, Quantasy and Collateral Damage made the above representations with knowledge of their falsity and/or with such utter disregard and recklessness as to whether they were true or false that such knowledge may be inferred.

131.    Defendants made the representations with the intent of misleading Root into relying upon them and continuing in the business transaction with Quantasy.

132.    Plaintiffs justifiably relied on the representations.

133.    Plaintiffs were directly and proximately injured as a result of their reliance on Defendants' representations in an amount greater than $9.4 million.

## COUNT IV: Conversion
## Against All Defendants

134.    Plaintiffs restate the foregoing paragraphs as if fully rewritten herein.

135.    Plaintiffs owned or had a right to possess their funds at the time of the conversion.

136.    Silver, Campbell, Quantasy, Collateral Damage, McDaniel and Eclipse together converted the funds by a wrongful act or disposition of Plaintiffs' property rights by transferring the funds to Quantasy and then to Collateral Damage.  From Collateral Damage, Defendants transferred some of the funds to Eclipse to purchase multiple multi-million dollar coastal properties.

137.    Plaintiffs demanded the return of the funds from Defendants after Defendants exerted dominion or control over the property.  On or about June or July 2022, when Root's finance department became aware of the excessive and unauthorized spend from the marketing department, it demanded the return of funds from Quantasy.

138.    Quantasy and Campbell refused to return all of the stolen funds to Plaintiffs. Instead, Quantasy returned a total of $2.8 million of the $15.9 million paid to Quantasy.

139.    Plaintiffs were injured by Defendants' conversion in an amount greater than $9.4 million.

## COUNT V: O.R.C. 2307.60, 2307.61 Civil Action for Criminal Theft
## Against All Defendants

140.    Plaintiffs restate the foregoing paragraphs as if fully rewritten herein.

141.    By stealing money from Plaintiffs, Defendants Silver, Campbell, Quantasy, Collateral Damage, Eclipse, and McDaniel have committed a theft offense under Ohio law.

142.    Defendants, with purpose to deprive Plaintiffs of the funds, knowingly obtained or exerted control over the funds without Plaintiffs' consent, and/or beyond the scope of the express or implied consent Plaintiffs gave Defendants, and/or by deception.

143.    Silver did not have Plaintiffs' permission to transfer funds to Quantasy under the circumstances alleged herein in which Quantasy transferred the majority of Root's funds to Collateral Damage, a concealed third party.

144.    Campbell, Quantasy, Collateral Damage, Eclipse, and McDaniel all exerted control over the funds without Plaintiffs' consent because Silver did not have Plaintiffs' consent to transfer those funds to them.  As described herein, Campbell, Quantasy, Collateral Damage, Eclipse, and McDaniel took steps to induce and actively conceal their scheme from Plaintiffs.

145.    Campbell and Quantasy exerted control over the funds beyond the scope of the express or implied consent Plaintiffs gave them by subcontracting work and paying millions of dollars to Collateral Damage without Root's knowledge or permission.

146.    As a result of Defendants' theft of the funds, Plaintiffs suffered damages in an amount greater than $9.9 million.

### COUNT VI: O.R.C. 2913.05 Civil Action for Criminal Act of Telecommunications Fraud Against Silver, Campbell, Quantasy, and Collateral Damage

147.    Plaintiffs restate the foregoing paragraphs as if fully rewritten herein.

148.    Defendants, having devised a scheme to defraud, knowingly transmitted by means of a telecommunications device a writing with the purpose to execute or otherwise further the scheme to defraud.

149.    As set forth above, Defendants Silver and Campbell communicated via text message, WhatsApp, and Silver's personal email throughout the relevant time period to act on

behalf of Quantasy and Collateral Damage as part of their scheme to defraud Plaintiffs. By way of example:

a.     Silver first messaged Campbell via text message to discuss Root hiring Quantasy to perform marketing work.

b.     Silver and Campbell, via text message, communicated about the SOW in December 2021.

c.     Then, using WhatsApp, Silver and Campbell negotiated and decided how to split up each of Root's payments between Quantasy and Collateral Damage.

d.     After Quantasy presented a PowerPoint presentation to Root, Silver told Campbell via text message that even though Root's leadership was not impressed by the presentation, he could hire Quantasy because he had "the autonomy to do what I need to."

e.     Silver sent fraudulent Collateral Damage invoices to Campbell via electronic messaging.

f.     Silver, Quantasy, and Campbell used electronic messaging to direct Root to make fraudulent payments by wire to Quantasy;

g.     Silver, Campbell, Lanskie, Collateral Damage, and Quantasy used electronic messaging to direct Quantasy to make fraudulent payments by wire to Collateral Damage;

h.     Silver and Campbell, on behalf of Quantasy and Collateral Damage, regularly communicated via text and WhatsApp messages about payments between Root, Quantasy, and Collateral Damage;

      i.      Silver, Lanskie, and Campbell used text messaging, WhatsApp, and email accounts to create backdated, forged and otherwise fraudulent documents to cover up their scheme.

150.    Defendants Silver, Campbell, Quantasy, and Collateral Damage communicated via text message and WhatsApp to avoid detection of their fraudulent scheme.  Defendant Silver further used his personal email (as opposed to his provided Root email account) to avoid detection of his participation in the scheme.

151.    As a result of Defendants' transmissions, Plaintiffs suffered damages in an amount greater than $9.9 million.

### COUNT VII: Breach of Contract Against Silver

152.    Plaintiffs restate the foregoing paragraphs as if fully rewritten herein.

153.    The Employment Agreement and Conflicts of Interest Policy are valid contracts between Caret Holdings and Silver.

154.    Caret Holdings fully performed its obligations under the contracts.

155.    In his Employment Agreement, Silver agreed to devote his "full-time energies and attention to the business affairs" of Caret Holdings; and to perform his "duties, responsibilities and functions to [Caret Holdings] . . . in a diligent, trustworthy, professional, ethical and efficient manner"; and to "comply with the policies and procedures of [Caret Holdings]."  The Conflicts of Interest Policy provided that:  "Root expects all employees to conduct themselves and company business in a manner that reflects the highest standards of ethical conduct and in accordance with all federal, state, and local laws and regulations.  This includes avoiding real and potential conflicts of interest."

156.    Silver breached his employment agreement and the Conflicts of Interest Policy as described herein, by at least the following actions: (1) directing Root's funds to be paid to his own company Collateral Damage, (2) concealing Collateral Damage's existence and his affiliation with Collateral Damage from Root; (3) failing to conduct himself ethically in accordance with the law; (4) engaging in an ongoing conflict of interest; and (5) using Root's funds to make real estate purchases via Eclipse.

157.    As a direct and proximate cause of Silver's breaches of the contract, Plaintiffs have suffered damages greater than $9.9 million.

## COUNT VIII: Breach of Contract Against Quantasy

158.    Plaintiffs restate the foregoing paragraphs as if fully rewritten herein.

159.    SOW #1 and SOW #2 are valid contracts between RIA and Quantasy.

160.    RIA fully performed its obligations under SOW #1 and SOW #2.

161.    Quantasy breached the contracts by, among other things: failing to provide the agreed-upon marketing services to Root as set forth in SOW #1 and SOW #2 and by entering into a purported subcontract with Collateral Damage without Root's knowledge or permission.

162.    Further, Quantasy breached the implied covenant of good faith and fair dealing.

163.    As a direct and proximate cause of Quantasy's breaches of the contract, Plaintiffs have suffered damages greater than $9.4 million.

## COUNT IX: Breach of Fiduciary Duty Against Silver

164.    Plaintiffs restate the foregoing paragraphs as if fully rewritten herein.

165.    As Root's CMO, Silver had a fiduciary duty to perform his job duties in good faith, in a manner he reasonably believed to be in the best interests of Root, and with the care that an ordinarily prudent person in the same position would use under similar circumstances.

166.     Silver breached his duty by diverting Root's funds to Collateral Damage.  As set forth herein, this included:  agreeing to a scheme with Quantasy and Campbell designed to defraud Root of funds through a series of false transactions claiming that Quantasy and Collateral Damage had provided services when neither had; failing to disclose the existence of Collateral Damage and his affiliation with Collateral Damage to Root management; utilizing Collateral Damage to submit false invoices to Quantasy for services not rendered, nor ever rendered, for Root's benefit, but rather for his own personal gain; causing a certificate of organization for Collateral Damage to be filed with the Georgia Secretary of State in an attempt to hide Silver's affiliation with Collateral Damage from Root; creating false and forged invoices, contracts, subcontracts and purported work product to further the scheme; abusing his authority at Root to facilitate the payment of Root funds to Collateral Damage through Quantasy that were ultimately for his personal gain; directing Ben-Her to transfer a portion of Root's payments to Collateral Damage; and ultimately using the ill-gotten funds received from Root through Quantasy, Ben-Her and Collateral Damage for his personal benefit, including the purchase of luxury homes in California and Florida.

167.     Silver did not reasonably believe that he was acting in Root's best interest.

168.     An ordinarily prudent person in the same situation would have used substantially greater care in performing their duties as CMO.

169.     In fact, Silver deliberately intended to cause injury to Plaintiffs and/or acted with reckless disregard to the best interests of Root.

170.     As a result of Silver's failure to observe his duty, Plaintiffs suffered damages in an amount greater than $9.9 million.

### COUNT X: Civil Conspiracy
### Against All Defendants

171.     Plaintiffs restate the foregoing paragraphs as if fully rewritten herein.

172. Through the foregoing fraudulent and tortious conduct, Defendants have maliciously and purposely conspired and combined to cause injury to Plaintiffs.

173. Defendants have caused injury to Plaintiffs through separate, unlawful acts of fraud and tortious conduct, including but not limited to the following: agreeing to a scheme designed to defraud Root of funds through a series of false transactions claiming that Quantasy and Collateral Damage had provided services when neither had; failing to disclose the existence of Collateral Damage to Root; utilizing Collateral Damage to submit false invoices to Quantasy for services not rendered, nor ever rendered, for Root's benefit; causing a certificate of organization for Collateral Damage to be filed with the Georgia Secretary of State in an attempt to hide Silver's affiliation with Collateral Damage from Root; creating false invoices, contracts, purported work product and subcontracts to further the scheme; funneling Root's payments to Ben-Her to Collateral Damage; and ultimately using the ill-gotten funds received from Root through Quantasy, Ben-Her, and Collateral Damage for, among other things, the purchase of luxury homes in California and Florida.

174. Defendants' malicious combination has injured Plaintiffs in an amount greater than $9.9 million.

## PRAYER FOR RELIEF

**WHEREFORE**, in consideration of the foregoing, Plaintiffs seek:

A.  Compensatory damages, jointly and severally from all Defendants, in an amount greater than $75,000;

B.  A temporary restraining order and a preliminary and permanent injunction to enjoin Defendants from placing any mortgage and/or other lien on, or selling the property located at 13105 Biscayne Island Terrace, Miami, Florida and/or 9125 North

Bayshore Drive Miami, Florida and/or 2543 Walnut Avenue, Venice, California 90291, until this matter is resolved on the merits or by leave of this Court;

C.    A temporary restraining order and preliminary injunction to enjoin Defendants from using, converting, transferring, or disposing of any of their assets, including the property located at 13105 Biscayne Island Terrace, Miami, Florida and/or 9125 North Bayshore Drive Miami, Florida and/or 2543 Walnut Avenue, Venice, California 90291, except as normal day-to-day transactions;

D.    Pre- and post- judgment interest;

E.    Punitive damages jointly and severally from all Defendants;

F.    Attorneys' fees and costs;

G.    Any other declarative, injunctive, or other equitable relief this Court deems just and appropriate.

Respectfully submitted,

*/s/  William D. Kloss, Jr.*
William D. Kloss, Jr. (0040854), Trial Attorney
Elizabeth S. Alexander (0096401)
Grace E. Saalman (0101603)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6360  Fax: (614) 719-4807
wdklossjr@vorys.com
esalexander@vorys.com
gesaalman@vorys.com

Matthew L. Kutcher (IL Bar No. 6275320*)*
(*application for pro hac vice forthcoming*)
COOLEY LLP
110 N. Wacker Drive Suite 4200
Chicago, IL 60606
Phone (312)-881-6500
Fax (312)-881 6598
mkutcher@cooley.com

Kristine A. Forderer (CA Bar No. 278754)
(*application for pro hac vice forthcoming*)
COOLEY LLP
3 Embarcadero Center
San Francisco, CA 94111
Phone (415) 693-2128
kforderer@cooley.com

*Counsel for Plaintiffs*

## JURY DEMAND

Plaintiffs request a trial by jury on all issues so triable.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ William D. Kloss, Jr.
William D. Kloss, Jr. (0040854), Trial Attorney
Elizabeth S. Alexander (0096401)
Grace E. Saalman (0101603)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6360  Fax: (614) 719-4807
wdklossjr@vorys.com
esalexander@vorys.com
gesaalman@vorys.com

*Counsel for Plaintiffs*

</div>

Case 2:23-cv-00669-MDC Document 22 Filed 06/23/23 Page 51 of 72 PageID #: 5244

## VERIFICATION OF FIRST AMENDED COMPLAINT FOR
## DAMAGES AND INJUNCTIVE RELIEF

I, Robert Bateman, certify that I am the Chief Financial Officer of Root, Inc., which is the parent company of Caret Holdings, Inc. and Root Insurance Agency, LLC. I am authorized to make this verification on behalf of Root, Inc., Caret Holdings, Inc., and Root Insurance Agency, LLC. I certify that I have reviewed the foregoing First Amended Complaint. The facts and statements set forth therein are true to the best of my knowledge, information and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 14 day of February, 2023 in Columbus, Ohio.

Robert H Bateman

Robert Bateman

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was served on this 14th day of February 2023, via email upon counsel for Quantasy & Associates, LLC and William Campbell, via email and certified mail upon Brinson Caleb Silver, and via certified mail upon Paige McDaniel, Collateral Damage, LLC, and Eclipse Home Design, LLC.

**Collateral Damage, LLC**
Registered Agent: LEGALZOOM.COM, Inc.
101 N Brand Blvd., 11th Floor
Glendale, CA 91203

**Eclipse Home Design, LLC**
Registered Agent: United States
Corporation Agents, Inc.
651 N. Broad St., Suite 201
Middletown, DE 19709

**Paige McDaniel**
5576 Alexanders Lake Rd.
Stockbridge, GA 30281

**Brinson Caleb Silver**
1550 Michigan Avenue, Apt. 3
Miami Beach, FL 33139
brinsonsilver@gmail.com
hello@bc-silver.com

**Matthew D. Ridings** (0079402)
THOMPSON HINE LLP
127 Public Square, 3900 Key Center
Cleveland, Ohio 44114
Telephone: 216.566.5561
Facsimile: 216.566.5800
Matt.Ridings@ThompsonHine.com

*and*

**Jamar T. King** (0091093)
THOMPSON HINE LLP
10050 Innovation Drive, Suite 400
Miamisburg, OH 45342
Telephone: 937.443.6852
Facsimile: 937.443.6635
Jamar.King@ThompsonHine.com

*Counsel for Quantasy & Associates,*
*LLC and William Campbell*

*/s/ William D. Kloss, Jr.*
William D. Kloss, Jr. (0040854)

*Counsel for Plaintiffs*

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

ROOT, INC., *et al.*,

              Plaintiffs,      :

                                    Case No. 2:23-cv-512

v.                         Judge Sarah D. Morrison
                                    Magistrate Judge Chelsey M.
                                    Vascura

BRINSON CALEB SILVER, *et al.*,  :

              Defendants.

## ORDER APPOINTING RECEIVER

Root, Inc., Caret Holdings, Inc., and Root Insurance Agency, LLC (together, "Root") filed this action against, *inter alia*, Brinson Caleb "B.C." Silver, Collateral Damage, LLC, and Eclipse Home Design, LLC, asserting claims of racketeering, fraud, conversion, theft, breach of contract, breach of fiduciary duties, and civil conspiracy. (Am. Compl., ECF No. 20.) The matter is before the Court on Root's motion for appointment of a receiver. (ECF No. 74, 75, 92, 93.) The Court held in-person evidentiary hearings on May 9, 2023, and May 12, 2023. (ECF No. 85, 97.) At the May 12 hearing, the Court granted Root's motion and appointed Jerry E. Peer, Jr. of Peterson Conners LLP to serve as receiver. The ruling was memorialized in a short order docketed that day. (ECF No. 99.) This Order expands upon that ruling.

## I.    BACKGROUND

Root's claims center on an alleged scheme, orchestrated by Silver, to divert funds from Root (his former employer) to entities under his control (Collateral Damage and Eclipse) through sham vendor contracts. (*See* Am. Compl., *generally*.)

The Amended Complaint alleges that Silver used the diverted funds in part to purchase three pieces of luxury real estate. (*Id.*, ¶¶ 86–91.)

When it came to light that Silver listed one of the properties for sale, Root filed a Motion for Temporary Restraining Order and Preliminary Injunction. (ECF No. 21.) On February 16, 2023, the Court issued a Temporary Restraining Order ("TRO") enjoining Silver from (i) disposing of the properties without leave of Court; (ii) using, converting, selling, or otherwise disposing of any assets in their possession, custody, and control in amounts greater than $5,000; (iii) and incurring charges or cash advances on any credit card, debit card, or checking card, or incurring liens or encumbrances on real personal property or other assets. (ECF No. 30.) The TRO permitted Silver to "pay personal expenses for day-to-day living in an amount no greater than $5,000." (*Id.*) On February 27, 2023, the Court entered an Agreed Preliminary Injunction ("API") imposing, in relevant part, the following restrictions:

> 4. Silver shall not individually, nor through others (including but not limited to any entity Silver owns or controls whether in whole or part) use, convert, sell or otherwise dispose of any assets in his possession, custody, and control totaling more than $5,000 without leave of this Court;

> 5. Silver shall not individually, nor through others (including but not limited to any entity Silver owns or controls whether in whole or part), incur charges or cash advances on any credit card, debit card, or checking card or incur liens or encumbrances on real personal property or other assets, including intangible assets. Notwithstanding, Silver may pay personal expenses for day-to-day living in an amount no greater than $7,500 in total per month. Any amount greater than that shall require leave of this Court;

(ECF No. 42.)

2

On May 2, 2023, Root filed a motion alleging that Silver and Eclipse had been using and transferring assets vastly in excess of the limits set out in the API. (ECF No. 74.) Root sought a finding of civil contempt and appointment of a receiver to ensure compliance with the API. (*Id.*) After a duly noticed hearing (for which Silver failed to appear), the Court found Silver and Eclipse in contempt of court. (ECF No. 86.) The Court invited further briefing on the propriety of appointing a receiver, which Root provided—along with still more evidence of lavish spending on Silver's part. (ECF No. 72, 73.)

## II. ANALYSIS

"A district court enjoys broad equitable powers to appoint a receiver over assets disputed in litigation before the court." *Liberte Cap. Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006). *See also* Fed. R. Civ. P. 66. Nonetheless, "[a] receivership is an 'extraordinary remedy' that a court should employ with the 'utmost caution' and grant 'only in cases of clear necessity to protect plaintiff's interests in the property.'" *Pension Ben. Guar. Corp. v. Evans Tempcon, Inc.*, 630 F. App'x 410, 414 (6th Cir. 2015) (quoting 12 Fed. Prac. & Proc. Civ. § 2983 (3d ed.)). So, in considering a motion to appoint a receiver, the Sixth Circuit directs district courts to weigh:

> whether the property at issue is in "imminent danger of being lost, concealed, injured, diminished in value, or squandered," whether the defendant engaged in fraudulent conduct, "the inadequacy of the available legal remedies," the lack of less drastic equitable remedies, and the likelihood that the appointment will do more good than harm.

*Id.* (alterations omitted).

3

This Court made the following on-the-record findings at the May 12 hearing:

- The documentary evidence shows unrestrained use and transfer of assets by Silver and Eclipse while the API was in effect. Eclipse sent more than $40,000 in ACH payments to an unknown entity, NEWREZ-SHELLPOIN. (ECF No. 75-3.) And Silver spent lavishly while traveling the globe. For example, he spent $20,000 on plastic surgery and another $8,000 at a luxury resort on Bali (among many, many other extravagant expenditures); he transferred tens of thousands to his PayPal and Venmo accounts; and, on March 31, 2023, he closed his account at Blue Ridge Bank by withdrawing more than $130,000 in cash. (ECF Nos. 75, 93.) Accordingly, the property at issue is in imminent danger of being lost, concealed, or squandered.

- Silver is alleged to have engaged in fraudulent conduct.

- Available legal remedies are inadequate, and there are no less-drastic appropriate equitable remedies.

- Finally, the appointment of a receiver over the assets of Silver, Eclipse, and Collateral Damage will do more good than harm.

Accordingly, the motion to appoint a receiver was granted.

## III. TERMS OF RECEIVERSHIP

The terms of the receivership are set forth below:

1.     Jerry E. Peer, Jr. (the "Receiver") of Peterson Conners LLP, whose business address is 545 Metro Place South, Suite 435, Dublin, Ohio 43017, is hereby appointed the federal equity receiver, custodian and liquidator for all personal property, monetary, and real property assets in the possession, custody, or control of Brinson Caleb "BC" Silver, Collateral Damage, LLC, and Eclipse Home Design, LLC (collectively, the "Receivership Defendants") effective upon the Receiver's posting of the bond as required below and taking the oath required by law. The Receiver is hereby authorized to take possession and control of all of the real and personal property of Receivership Defendants, including but not limited to, any and all cash

and cash deposits; receivables and accounts receivable; obligations or commitments owed by any person or entity including equipment, furniture, fixtures and deposit accounts held by third parties; the general intangibles; any real property (the "Real Property") including, but not limited to 13105 Biscayne Island Terrace, Miami, Florida 33181[1], 9125 North Bayshore Drive, Miami, Florida 33138, and 2543 Walnut Avenue, Venice, California 90291; any and all tax attributes; and all other assets of whatever kind or nature belonging to the Receivership Defendants and the Receiver shall have all authority and power of a receiver under 28 U.S.C. §§ 754, 959 and 1692, Rule 66 of the Federal Rules of Civil Procedure, this Court's inherent powers, and Ohio laws where applicable (the "Receivership Authorities"), and as ordered further by this Court. Hereinafter, all of the assets described in this paragraph shall be referred to as the "Receivership Property" or, simply, the "Property".

2.    The Receiver shall take immediate possession, control, management, operation and charge of the Receivership Defendants and Receivership Property and maintain all such entities and property in a Receivership Estate (the "Receivership Estate"). This Court hereby vests the Receiver with authority and jurisdiction over the Receivership Estate and the Receivership Property to the maximum extent permitted by the Receivership Authorities, and hereby empowers and permits the Receiver to take any and all actions necessary and proper to carry

---

[1] The Court is aware that the property located on Biscayne Island Terrace is under contract for sale in an arm's-length transaction. (*See* ECF No. 63.) The sale set to close on or around May 19, 2023. This Order is in no way intended, nor shall

out the express provisions of this Order, including but not limited to the following

powers and duties:

    a.  The Receiver shall take immediate possession, control,
management and charge of the Receivership Defendants'
accounting books and records of whatever nature and wherever
located, in the possession of the Receivership Defendants or any
other person or entity, including all information regarding the
assets, liabilities, equity, income, and expenses of the
Receivership Defendants. The Receiver shall take immediate
possession, control, management, and charge of all of the
Receivership Defendants' financial statements, ledgers and
journals, balance sheets, trial balances, statements of cash flows,
income statements, statements of retained earnings, accounting
journals, and books of original entry, including but not limited to
(i) accounts receivable, rent rolls, and any other documentation
which indicate the amounts owing from lessees and other debtors
of the Receivership Defendants on accounts receivable and from
whom such amounts are or were owing and when any amounts
were collected and deposited; (ii) fixed asset ledgers, schedules,
records, documentation and/or appraisals of the Receivership
Defendants' equipment, motor vehicles, boats and their engines,
accessories, furniture inventory, furnishings, and supplies;
(iii) inventory listings or other detail; (iv) all information and
documentation which relates or pertains to any checking, saving,
banking, and money management accounts of any kind or nature
belonging to the Receivership Defendants, or into which any
proceeds of the collection or sale of any asset of the Property
have been deposited; (v) all accounts payable documentation and
information and all correspondence or written documents
regarding negotiations with current accounts or proposed
accounts; (vi) all information of whatever type or nature
regarding the payroll and benefits of the employees of the
Receivership Defendants, including wage or salary information,
medical insurance information, child support payments or other
employee deductions withheld or to be withheld, and all
information regarding withholding taxes whether federal, state,
or local, and any information regarding any and all of the
employer matching obligations or the employer payroll tax
obligations; (vii) all information and documentation of any asset
transfers by the Receivership Defendants any time in the past;

---

it be construed to, interfere with the consummation of that transaction.

(viii) all information and documentation regarding the federal, state, and local tax liabilities and tax attributes of the Receivership Defendants, including any and all federal, state, and local tax returns filed or unfiled, and any documents generated during the planning of any construction project, including the Real Property, and the preparation and filing of tax returns for the Receivership Defendants; (ix) all contracts and leases pertaining to the Property and/or to which any Receivership Defendant is a party; (x) all information and documentation of any other financial transaction or interest in and any asset of any Receivership Defendant which may be necessary or pertinent to the Receiver's operation and management of the Receivership Defendants' assets; and (xi) any documentation that relates or pertains to the Receivership Defendants and is kept in the ordinary course of their business in connection with the record-keeping or accounting. The information described in this subparagraph shall hereinafter be referred to as the "Books and Records."

b. The Receiver shall take immediate possession, control, management, and charge of the Property, including all assets and property appertaining thereto consisting of all personal property, Real Property (including leasehold interests), all cash or cash equivalents including but not limited to rights, title and interest in and to all bank accounts, all accounts and notes receivable, all inventory of any type or nature, all furniture, fixtures, equipment, computers (hardware and software), and all general intangibles, including, but not limited to, all licenses and liquor licenses applied for, owned or utilized by the Receivership Defendants, rights in leases, rights to proceeds from any insurance or sales of equipment or other asset, all choses in action and causes of action, including avoidance actions for transfers of any of the assets of the Receivership Defendants for less than equivalent value against the transferees of those assets, and any other asset or interest owned by the Receivership Defendants or in which the Receivership Defendants asserts an interest which has any value which pertains to the Property, and the Books and Records and the Property are hereby placed *in custodia legis* and are subject to the exclusive jurisdiction of this Court. The Receiver shall not be charged with the responsibility to take possession of any real estate or other assets which had or have existing hazardous or toxic contamination nor shall the Receiver be required to take possession of any hazardous or toxic materials owned or used by the Receivership Defendants. Should the Receiver elect to take possession of, or exercise his dominion

and control over, any real estate, hazardous or toxic materials, pollutants or contaminants, he shall do so in his capacity as Receiver for the Property.

c. The Receiver shall have the authority to operate and manage the LLC Receivership Defendants and the Property as he deems prudent in his sole discretion throughout the litigation, subject to further order of this Court. The Receiver shall preserve and care for any and all of the Property and utilize any and all of the Property to preserve and maximize the value of the Property.

d. The Receiver shall secure the business premises, business equipment, data and documents; take control of all means of communication with investors, secured and unsecured lenders, landlords, vendors, agents and others doing business with the Receivership Defendants. The Receiver shall have the authority to take all reasonable and necessary steps to wind-down and liquidate the business operations.

e. The Receiver shall have the authority, responsibility, and duty to review the participation of the directors, officers, or managers of any entity whose stock shares or membership interest he holds and based upon his business judgment, to remove any director, officer or manager and nominate and elect any replacement director, officer, or manager. However, the Receiver shall not remove any officer or director without seeking and obtaining leave of Court. The Receiver is hereby authorized to take any action, execute any document, and do those things necessary to transfer a stock interest to himself, or accept admission as a member of any limited liability entity.

f. The Receiver shall, in his own business judgment, determine whether to file a plan for liquidation and distribution of the Property, and if the Receiver shall so determine, then, in conjunction with and in consultation with the Receivership Defendants' secured and general creditors, the Receiver shall submit such a plan to this Court for approval.

g. The Receiver is authorized to collect all profits, rents, receivables, and revenues of any nature whatsoever generated from the Property and/or the business operations of the Property and to pay all necessary expenses relating to said operations, including his fees and the fees of his attorneys, as he deems prudent in his sole discretion and consistent with the terms of

this Order, from funds in his possession, whether such funds are derived from the operation or the sale of the Property.

h.  The Receiver shall have the authority without further order of this Court to maintain or purchase insurance from any agent or carrier, of any type reasonably necessary or desirable, on all the Property, subject to maintaining adequate coverage appropriately and naming appropriate loss payees as any properly perfected security interests provide within the corresponding security agreement.

i.  The Receiver is authorized to establish or maintain one or more bank accounts in the Receiver's name for its operations as Receiver in this matter at any federally insured bank as reasonably needed to engage in business operations on behalf of the Property. The Receiver shall keep a true and accurate account of any and all receipts and disbursements which the Receiver shall receive or make as Receiver in the course of the operation of the Property.

j.  The Receiver is hereby authorized to negotiate, enter into, and execute leases of any portion or part of the premises of the Real Property at rental rates and for terms of years consistent with those that the market will bear, which he in his business judgment concludes are in the best interest of the creditors of the Receivership Estate.

k.  The Receiver is authorized to negotiate and effect an orderly sale, transfer, use, or assignment of all or a portion of any of the Property in or outside of the ordinary course of business of the Receivership Defendants and, from the proceeds thereof, to pay the secured and unsecured indebtedness of the Property, including the Real Property. Payments to creditors by the Receiver shall include trade indebtedness which arises during the course of the Receiver's operation of the Property, which shall be paid first from the sale proceeds, together with the fees and expenses of the Receiver and his attorneys, accountants, and other professionals. The Receiver is authorized to conduct such a sale of the Property in any manner which he, in his good faith and reasonable discretion, believes will maximize the proceeds received from the sale.

l.  The Receiver is authorized to institute, prosecute, or intervene in any lawsuit or summary proceeding against any other person or entity to preserve and/or maximize the value of the Property or

to obtain possession of any of the Property unlawfully in the possession of third parties.

m. The Receiver is authorized but not required to defend actions against the Property or the Receivership Defendants and may incur expenses to defend such actions to the extent that he believes, in his sole discretion, it will protect and preserve the Property.

n. The Receiver is authorized to perform pursuant to the terms of any existing contracts executed by any Receivership Defendant in connection with the Property to the extent that the Receiver determines, in his sole discretion, that such performance will preserve and maximize the value of the Property. The Receiver may reject contracts not deemed to be in the interest of creditors of the estate, and the holder of any contract so rejected shall be allowed a claim as an unsecured creditor of the Property, said claim to be calculated consistent with the law.

o. The Receiver shall seek Court approval before employing any assistants, servants, agents, tax accountants, financial accountants, or other persons deemed necessary or desirable to assist the Receiver in diligently executing the duties imposed upon the Receiver by this Order and pursuant to the Receivership Authorities.

p. The Receiver is authorized to repair the Property and its fixtures and appurtenances as needed. Such repairs shall be made at the time and in the way that the Receiver, in his sole discretion, deems reasonable and necessary in the circumstances. Such repairs and construction include the time and expense of relocating tenants or caring for tenants while their suites are under construction.

q. Any person or entity, other than the Receiver, is barred from placing any Receivership Defendant in bankruptcy proceedings.

3. Notwithstanding the foregoing, the Receiver and the Receivership Estate shall not be liable for the payment of taxes or assessments pre-dating the date of this Order. Any individual or entity receiving a copy of this Order is hereby enjoined and restrained from discontinuing service to the Receiver or the

Receivership Estate based upon the non-payment of such taxes prior to the date of this Order and from attempting to collect taxes from the Receiver pre-dating the date of this Order.

4.      No provision of this Order shall be deemed by any federal, state, or local governmental agency, or accrediting agency, as having triggered a substantive change of ownership or control requiring the approval of such agency. Further, the actions taken by the Receiver during the course of the receivership shall not be taken into account by any such agency in any future determination of whether the Receiver is qualified to hold the stock or membership interest of, or serve in any capacity with, an institution approved or regulated by that agency.

5.      Pursuant to the doctrines of *in custodia legis* and *lis pendens*, and in order for the Receiver to effectively manage, protect and preserve the Receivership Property and for all creditors, claimants, bodies politic, parties in interest, and all sheriffs, marshals, and other officials, and their respective attorneys, servants, agents, and employees and all other firms, persons and corporations be, and hereby are, enjoined and stayed from commencing or continuing any action at law or proceeding in equity to enforce any claim or foreclose any lien against the Receivership Property or against the Receiver in any court, and that all such entities and individuals are further stayed from executing or issuing or causing execution or issuance out of any court of any writ, process, summons, attachment, subpoena, replevin, execution or other process for the purpose of impounding or taking possession of or interfering with, or enforcing any claim or lien upon the

Receivership property or any property owned by or in the possession of the Receiver, and from doing any and all things whatsoever to interfere with the Receiver in the discharge of his duties in this proceeding with the exclusive jurisdiction of this Court over the Receivership Property and the Receiver.

6.    The Receivership Defendants and its agents and employees, and any other party in possession, shall turn over to the Receiver, as soon as possible or within three days from the date of this Order, any and all Books and Records.

7.    The Receivership Defendants and their agents and employees, and any other party in possession, shall turn over to the Receiver, as soon as possible or within three days from the date of this Order, all sums in existence on the date hereof that are related or pertain to, or are derived from the Property, including but not limited to (a) all cash on hand; (b) all cash equivalents and negotiable instruments (such as checks, notes, drafts or other related documents or instruments); (c) all sums held in accounts in any financial institutions, including but not limited to, all sums of any kind relating to the use, enjoyment, possession, improvement, or occupancy of all or any portion of the Property; and (d) any other information requested by Receiver pertaining to any Receivership Defendant.

8.    Except as directed by the Receiver, the Receivership Defendants, their affiliates, agents, officers, directors, shareholders, members, employees, representatives, or creditors, and all other persons or entities, are hereby prohibited from taking any act for or on behalf of any Receivership Defendant interfering in any way with the acts of the Receiver, and from in any way, manner, or means

wasting, disposing of, transferring, selling, assigning, pledging, canceling, concealing, interfering with, or hypothecating any of the Books and Records or the Property. Upon the request of the Receiver, the foregoing persons and entities shall cooperate and affirmatively assist the Receiver in making available to the Receiver or his agents, the Books and Records and the Property. Nothing in this paragraph shall be construed to require a waiver of any attorney-client privilege.

9.     The Receiver and his agents, including his attorneys and any accountants or other professionals that are appointed by the Court, shall be entitled to reasonable compensation for services rendered and reimbursement for expenses incurred which are (a) related to the Receiver's duties, rights, and obligations under this Order or any future orders of the Court and applicable law; (b) related to the administration, management, protection, or liquidation of the Property; or (c) related to the defense or prosecution of any claim or suit brought by or against the Receiver or by the Receiver against any person or entities. Such compensation of the Receiver and his agents, his counsel, and his accountants shall be paid consistent with the Receivership Authorities and this Order, and awarded from the Receivership Estate. As and for the payment of the Receiver's fees and expenses and the fees and expenses of his attorneys, accountants and other professionals, the Receiver is hereby granted a lien upon all of the assets in the Receivership Estate, which lien shall be a charge upon all property of whatsoever kind or nature in the Receivership Estate and the lien shall extend to all proceeds of or arising from the assets or other property in the Receivership Estate, including all after-acquired

property which but for the date of the acquisition would have been an asset of the Receivership Estate. If the Receivership Estate does not have funds to pay the fees and expenses of the Receiver and his attorneys, accountants and other professionals, those fees will be assessed as costs of this case.

10.     The Receiver shall be compensated at his normal hourly billing rate, which is the rate he charges in cases of like kind and complexity. At this time, the Receiver's billing rate is $150.00 per hour, plus reimbursement for all reasonable and necessary out of pocket costs and expenses.

11.     The Receiver is hereby authorized to engage the services of Peterson Conners, LLP, Gregory S. Peterson, Istvan Gajary, and Jerry E. Peer, Jr. to serve as counsel to Receiver. The hourly rates of counsel shall not exceed $250 per hour unless otherwise authorized by this Court.

12.     The Receiver and his attorneys, accountants, or other professionals hired by him may, at the Receiver's option, file with this Court monthly applications (or less frequent, if he deems appropriate), for payment of fees and expenses incurred in the conduct of this Receivership Estate, and each such application shall be served upon the parties to the case and all other interested parties who have requested that such applications be served upon them. The Receiver shall be authorized to pay the fees and expenses requested by the Receiver or his attorneys, accountants, or other professionals in any such application after ten days have expired after service has been effected, without further order of this Court. If any party or person files an objection to the fees and expenses of the Receiver, or of his

attorneys, accountants, or other professionals, the Court shall consider the objection in the ordinary course. Pending consideration of the objection, the Receiver shall be authorized to pay any portion of the fees and expenses not subject to the objection.

13.     The Receiver shall have full and unrestricted access to all of the Property, and the Receivership Defendants and their officers, directors, shareholders, employees and agents, and any other party, are directed to take all steps necessary to give the Receiver access to the Real Property.

14.     The Receiver may, from time to time, make payments to creditors on account of pre-receivership claims, especially secured creditors, according to their interests as they may appear. The Receiver, in his sole discretion, shall determine when or if it is appropriate to make payments to creditors, if any. All payments made prior to the conclusion of the Receivership shall be made after application to the Court and pursuant to Court Order.

15.     The Receiver shall, under his authority to operate and manage the businesses of the Receivership Defendants, operate and manage such businesses in compliance with applicable statutes. Nothing in this Order shall be read or interpreted, however, to abrogate the Receiver's immunities from personal liability for conduct related to his receivership duties.

16.     The bond of the Receiver is set at $100.00.

17.     The Court retains jurisdiction with respect to any matters addressed in this Order, including without limitation any and all matters relating to or affecting the Receivership Estate, the Property, the Receiver ,and the scope of authority

granted the Receiver hereunder. The terms of this Order shall continue in full force and effect unless and until further order of this Court.

18.     For purposes of clarity, the Agreed Preliminary Injunction remains in full force and effect except as expressly revised by this Order. By way of example, the Receiver shall permit Silver a monthly allowance of not more than $7,500 for day-to-day expenses.

19.     In accordance with the oral motion made at the May 12 hearing and the Court's ruling thereon, Paragraph 3 of the Agreed Preliminary Injunction shall be modified to direct all net proceeds from the sale of the Properties as defined therein (or any other Real Property) shall be paid to an escrow account with Peterson Conners LLP under the direction and supervision of Receiver.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**ROOT, INC.,** *et al.*,

        **Plaintiffs,**        :

    **v.**                                **Case No. 2:23-cv-512**
                                      **Judge Sarah D. Morrison**
                                      **Magistrate Judge Chelsey M. Vascura**

**BRINSON CALEB SILVER,** *et al.*,    :

        **Defendants.**

## <u>ORDER AMENDING ORDER APPOINTING RECEIVER</u>

This matter is before the Court on the Receiver's Motion for Reappointment of Receiver. (ECF No. 119.) For good cause shown, the Motion is **GRANTED**. The May 17, 2023 Order Appointing Receiver is hereby amended at Section III, Paragraph 1 (ECF No. 101, PAGEID # 891) to expressly include the real property located at 19803 Vista Del Otero, Ramona, California 92065 in the definition of Real Property included in the Receivership Property.

      **IT IS SO ORDERED.**

                                 /s/ Sarah D. Morrison
                                 **SARAH D. MORRISON**
                                 **UNITED STATES DISTRICT JUDGE**

## PROOF OF SERVICE

*Root, Inc., et al. v. Brinson Caleb "BC" Silver William Campbell, et al.*

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of .  My business address is 301 North Lake Avenue, 7th Floor, Pasadena, CA 91101-1807.

On June 13, 2023, I served the following document(s) described as **AMENDED NOTICE OF FILING PURSUANT TO 28 USC § 754** on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

### SEE ATTACHED SERVICE LIST

**BY MAIL:**  I am "readily familiar" with Hunt Ortmann Palffy Nieves Darling & Mah, Inc.'s practice for collecting and processing correspondence for mailing with the United States Postal Service.  Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business.  Such envelope(s) were placed for collection and mailing with postage thereon fully prepaid at Pasadena, California, on that same day following ordinary business practices.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on June 13, 2023, at Pasadena, California.

*Alexandra Blanco*
Alex Blanco

3

AMENDED NOTICE OF FILING
PURSUANT TO 28 USC § 754

1

**SERVICE LIST**

2
3
4
5
6
7
8

Istvan Garjary, Esq.
Peterson Connors LLP
545 Metro Place South, Suite 435
Dublin Ohio 43017
igajary@petersonconners.com
*Counsel for Receiver*

Matthew L. Jalandon
W. Benjamin Reese
Flannery, Georgalis LLC
175 S. Third Street, Suite 1060
Columbus, Ohio 43215
mjalandoni@flannerygeorgalis.com
breese@flannerygeorgalis.com
*Counsel for Defendants, Brinson*
*Caleb Silver, Eclipse Home Design,*
*LLC and Collateral Damage, LLC*

9
10
11
12
13
14
15
16
17

William D. Kloss, Jr.
Elizabeth S. Alexander
Grace E. Saalman
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
wdklossjr@vorys.com
escalexander@vorys.com
gesaalman@vorys.com
*Counsel for Plaintiffs, Root, Inc., Caret*
*Holdings, Inc., Root Insurance Agency,*
*Inc.*

Mathew D. Ridings
Jamar T. Kings
Thompson Hine LLP
127 Public Square, 3900 Key Center
Cleveland, Ohio 44114
matt.ridings@thompsonhine.com
jamar.king@thompsonhine.com
*Counsel for Defendants, Quantasy &*
*Associates, LLC and William Campbell*

18
19
20

Paige McDaniel
5576 Alexanders Lake Road
Strockbridge, GA 30281

21
22
23
24
25
26
27
28

HUNT ORTMANN PALFFY
NIEVES DARLING & MAH, INC.
301 NORTH LAKE AVENUE, 7TH FLOOR
PASADENA, CALIFORNIA 91101-1807
Tel (626) 440-5200 • Fax (626) 796-0107

AMENDED NOTICE OF FILING
PURSUANT TO 28 USC § 754